UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| | |
|---|---|
| JUDITH A. BROWN,<br><br>             Plaintiff,<br><br>     vs.<br><br>SHIANN HAUPERT, IN HER INDIVIDUAL CAPACITY AS A POLICE OFFICER FOR THE CITY OF GETTYSBURG; DAVID MOGARD, IN HIS INDIVIDUAL CAPACITY AS CHIEF OF POLICE FOR THE CITY OF GETTYSBURG; CODY HOLZER, IN HIS INDIVIDUAL CAPACITY AS DEPUTY SHERIFF FOR THE COUNTY OF POTTER; CURTIS HAMBURGER, IN HIS INDIVIDUAL CAPACITY AS SHERIFF FOR THE COUNTY OF POTTER; GETTYSBURG, SOUTH DAKOTA, POTTER COUNTY, SOUTH DAKOTA,<br><br>             Defendants. | 3:21-CV-03019-RAL<br><br><br>OPINION AND ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT AND DENYING AS MOOT MOTION TO EXCLUDE EXPERT TESTIMONY |

      This case arises out of a traffic stop on August 26, 2020, outside of Gettysburg, Potter County, South Dakota, which culminated in the arrest of Plaintiff Judith A. Brown (Brown). Brown sued the City of Gettysburg, Potter County, and certain law enforcement officers employed by those governmental entities claiming unlawful arrest and excessive force, as well as alleging several state tort claims. Doc. 1. This Court dismissed one of the officers from the suit leaving Gettysburg Police Officer Shiann Haupert, Gettysburg Police Chief David Mogard, Potter County Sheriff Curtis Hamburger, and Potter County Sheriff's Deputy Cody Holzer as the remaining

individual defendants. Doc. 28. After discovery, Defendants Hamburger, Holzer, and Potter County (collectively Potter County Defendants) filed a motion for summary judgment, Doc. 33, as did Defendants Haupert, Mogard, and the City of Gettysburg (collectively Gettysburg Defendants), Doc. 37. Brown opposes both motions. Docs. 49, 51. The Gettysburg Defendants also filed a motion to exclude expert testimony of James Severson, Doc. 42, which Brown resists, Doc. 48. This Court held a hearing on February 28, 2023, where it heard arguments from the parties and watched what the parties agreed were the relevant portions of the bodycam and dashcam footage from the incident. For the reasons explained below, this Court grants the Potter County Defendants' Motion for Summary Judgment, grants the Gettysburg Defendants' Motion for Summary Judgment, and denies the Gettysburg Defendants' Motion to Exclude Expert Testimony as moot.

## I.     Standard on Motion for Summary Judgment

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); McManemy v. Tierney, 970 F.3d 1034, 1037 (8th Cir. 2020). Rule 56(a) places the burden on the moving party to establish the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. Id.; see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The nonmoving party must establish that a material fact is genuinely disputed by either "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence . . . of a genuine dispute[.]" Fed. R. Civ. P. 56(c)(1)(A), (B); see also Gacek v. Owens & Minor Distrib., Inc., 666 F.3d 1142, 1145–46 (8th Cir. 2012) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)). A party opposing a properly supported motion for summary judgment "may not rest upon mere allegations

or denials" in her pleading but "must set forth specific facts showing that there is a genuine issue for trial." Gacek, 666 F.3d at 1145–46 (citing Anderson, 477 U.S. at 256); see also Mosley v. City of Northwoods, 415 F.3d 908, 910 (8th Cir. 2005) (stating that a nonmovant may not merely rely on allegations or denials).

In ruling on a motion for summary judgment, the facts and inferences fairly drawn from those facts are "viewed in the light most favorable to the party opposing the motion." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587–88 (1986) (quoting United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam)); Taylor v. Riojas, 141 S. Ct. 52, 53 n.1 (2020) (per curiam); Intel Corp. Inv. Pol'y Comm. v. Sulyma, 140 S. Ct. 768, 779 (2020). However, if the record contradicts the non-moving party's account so that no reasonable jury could believe it, then such an assumption in favor of their version of facts is not made. Scott v. Harris, 550 U.S. 372, 380 (2007); Intel Corp. Inv. Pol'y Comm., 140 S. Ct. at 779; McManemy, 970 F.3d at 1037; Westwater v. Church, 60 F.4th 1124, 1129 (8th Cir. 2023).

## II.    Facts

In this case few facts are in dispute; the main disputes are over the characterizations of those facts.  Bodycam and dashcam videos capture the events at issue such that the disputed characterizations of the facts do not create genuine issues of material fact.

On August 26, 2020, Haupert was employed as an officer with the Gettysburg Police Department and was operating stationary radar on South Dakota Highway 212 monitoring vehicle speeds on the edge of Gettysburg.  Doc. 50 ¶¶ 1–2; Doc. 52 ¶ 2.  At approximately 4:00 p.m., Haupert observed a red 2015 GMC Yukon traveling more than the posted speed limit of 35 miles

per hour; upon activating her radar Haupert locked in the speed of the GMC at 47 miles per hour.[1]
Doc. 50 ¶¶ 3–5; Doc. 52 ¶ 3. Haupert activated her lights and Brown stopped her vehicle promptly
on the gravel shoulder of the highway. Doc. 50 ¶¶ 6–7; Doc. 52 ¶ 4. Haupert approached Brown's
driver side window to gather information from Brown. Doc. 36-2 at 1:14–2:05. Haupert requested
Brown's vehicle insurance information and Brown responded that she had a hard time reaching
for it due to two open heart surgeries within the last year and a half; Haupert then asked who the
insurance was through and appears not to make Brown retrieve the proof of insurance. Id. Brown
said that her driver's license had expired but that she had an extension to renew it. Id. at 2:05–
2:58. Upon questioning by Haupert, Brown admitted that she had not been wearing her seatbelt
and asked if Haupert was going to ticket her for that. Id. at 2:58–3:05. Haupert returned to her
patrol vehicle where she confirmed that Brown had received an extension to renew her expired
license. Haupert then learned from a Potter County Sheriff's deputy over her radio that he
recognized Brown's name and vehicle and reportedly had given her three prior warnings relating
to speeding. Id. at 3:55–9:55; Doc. 1 ¶¶ 27–29; Doc. 28. As discovery would later show, Brown
had received only one prior written warning. Doc. 40-3 at 18.

Haupert then returned to Brown's vehicle and informed Brown that she was being cited for
speeding and admonished Brown to renew her driver's license promptly. Doc. 36-2 at 11:20–
11:55; Doc. 50 ¶¶ 8–9; Doc. 52 ¶ 6. While explaining why the citation was being issued, Haupert
mentioned that another officer reported that Brown had previously been given warnings for
speeding. Doc. 36-2 at 12:00–12:06; Doc. 52 ¶ 6. At this point, Brown became upset, repeatedly
denying receiving past warnings. Doc. 36-2 at 12:15–12:30, 13:18–13:45. Haupert responded

---

[1] At one point in the bodycam video, Haupert refers to Brown's speed as 48 miles per hour, then
47 miles per hour, and ultimately tells Brown that she rounded down on the ticket to 45 miles per
hour. There is no genuine dispute that Brown's vehicle was speeding.

that Brown could go to court and fight the ticket if she wished. Id. After thoroughly and repeatedly expressing her displeasure with Haupert and the situation, Brown signed the ticket and passed it out the window to Haupert. Id. at 12:40–13:45; Doc. 50 ¶ 9; Doc. 52 ¶ 7. Haupert tried to return a copy of the citation to Brown, but she refused to accept it. Doc. 36-2 at 13:40; Doc. 52 ¶ 9. Haupert advised Brown that she needed a copy. Doc. 36-2 at 13:50; Doc. 52 ¶ 9. Brown then began to roll up her window and Haupert tossed a copy of the citation through the closing window. Doc. 36-2 at 13:51–18:54; Doc. 50 ¶ 10; Doc. 52 ¶ 9.

The dashcam captures that the brake lights of Brown's vehicle illuminated, and the bodycam shows Brown shifting as she was preparing to leave while Haupert was still at the driver's side door. Doc. 36-2 at 13:49; Doc. 53-1 at 16:06:49–16:06:55. Brown's vehicle began moving forward as Haupert turned back to her patrol car. Id. Brown then discarded the ticket out the window and Haupert appeared to react to the ticket being tossed out of the window. Doc. 50 ¶ 11; Doc. 52 ¶ 10; Doc. 53-1 at 16:06:55. Haupert turned around while still beside Brown's moving vehicle. Doc. 50 ¶¶ 11–12; Doc. 52 ¶ 10; Doc. 53-1 at 16:06:56. There is no evidence that Brown's vehicle swerved toward Haupert or spun out in the gravel shoulder of the highway, though the dash cam shows Brown accelerated to reenter traffic and slightly angled towards the highway. Doc. 53-1 at 16:06:56–:07:00. Regardless, Haupert testified that she was scared because of her proximity to the vehicle and prior experience with traffic stops. Doc. 52 ¶¶ 10, 12.

Haupert turned fully back towards the vehicle, reached for the driver's side door handle, and briefly ran alongside Brown's vehicle ordering her to stop the vehicle. Doc. 36-2 at 13:56; Doc. 50 ¶ 12; Doc. 52 ¶ 10; Doc. 53-1 at 16:06:57. Brown stopped the car shortly after Haupert grabbed the door handle and then braked hard enough for Haupert's bodycam to pick up the sound of the vehicle skidding to a stop on the gravel shoulder of Highway 212. Doc. 36-2 at 13:56–

13:58; Doc. 53-1 at 16:06:56–16:07:00. It took the car about half a car length to fully stop. Doc. 53-1 at 16:06:58–:07:00. In total, Brown's vehicle appeared to travel at least one car length but no more than two car lengths total. Id. at 16:07:00. As Brown's vehicle stopped, Haupert radioed for emergency assistance and opened the driver's door. Doc. 36-2 at 13:59–14:00; Doc. 52 ¶ 14; Doc. 53-1 at 16:07:01.

As the door opened, Brown can be heard saying "[y]ou want to fight girl?" Doc. 36-2 at 14:01–14:02. Haupert then told Brown to put the vehicle in park and turn it off. Id. at 14:03–14:05; Doc. 50 ¶¶ 13–14; Doc. 52 ¶¶ 11–12. Haupert ordered Brown to turn off the vehicle three times in just under ten seconds, during which time Brown turned away from the dashboard to face Haupert, put her feet on the running boards of the vehicle, and yelled at Haupert. Doc. 36-2 at 14:03–14:12. After failing to comply with Haupert's three verbal orders to turn off the car, Haupert grabbed Brown's left wrist and ordered her out of the car while pulling on Brown's wrist. Id. at 14:12–14:16; Doc. 50 ¶¶ 13–14; Doc. 52 ¶ 13. Brown resisted Haupert by remaining seated and variously holding onto the steering wheel or bracing her hand against the door frame while wedging her right foot in the door frame of the car. Doc. 36-2 at 14:20–14:56; Doc. 50 ¶¶ 16–17. Brown, while continually refusing to cooperate, told Haupert she has a medical condition, to which Haupert replied that Brown "should have thought about that." Doc. 36-2 at 14:15–14:17; Doc. 50 ¶ 21.

Continuing to struggle with Brown, Haupert informed Brown multiple times that she is under arrest for trying to hit Haupert with her vehicle. Doc. 36-2 at 14:34–14:48, 15:29–15:31; Doc. 50 ¶ 15. Brown repeatedly denied having tried to hit Haupert with her vehicle throughout the exchange. Doc. 36-2 at 14:34–14:48, 15:30–15:36. Brown also repeatedly told Haupert that she has a medical condition, at one point attempting to show her heart surgery scar by pulling

6

down her blouse, though she did not mention her recent knee surgery to Haupert. Id. at 14:50–
15:10; Doc. 50 ¶¶ 17–18, 21. Haupert at one point reached past Brown and turned off the vehicle.
Doc. 36-2 at 14:49; Doc. 50 ¶ 13. While waiting for backup to arrive, Haupert alternated between
attempting to pull Brown out of the car and just holding her arm or wrist and repeatedly ordered
Brown out of the car. Doc. 36-2 at 14:12–17:03; Doc. 52 ¶ 15.

Deputy Holzer was the first to arrive on scene and ordered Brown to get out of the car
twice. Doc. 36-2 at 17:02–17:09; Doc. 50 ¶ 19; Doc. 52 ¶ 16. Brown refused so Haupert and
Holzer then pulled Brown out of the car, with Holzer pulling her wrist and Haupert bracing
Brown's back and pushing her against the car. Doc. 36-2 at 17:09–17:18; Doc. 50 ¶ 20; Doc. 52
¶¶ 16, 19, 27. Holzer and Haupert removed Brown from the vehicle shortly after Holzer arrived
and without much apparent effort. Doc. 36-2 at 17:14–17:17. While being pulled from the car,
Brown made no sounds of distress, pain, or shock; rather the force used did not even break the
cadence of Brown's sentence as she disputed Haupert's version of events. Id. Haupert informed
Holzer that Brown has a medical condition while Brown was removed from and then pushed
against her vehicle to be handcuffed. Doc. 36-2 at 17:17–17:18; Doc. 50 ¶¶ 21–22; Doc. 52 ¶ 19.

Haupert then requested that Holzer walk Brown to Haupert's patrol vehicle, which Holzer
did. Doc. 36-2 at 18:15–18:31; Doc. 36-4 at 1:35–2:52; Doc. 50 ¶ 23. Brown did not appear from
the bodycam footage to have any difficulty walking to Haupert's patrol vehicle. Doc. 36-4 at 1:35–
2:08. Upon reaching the vehicle, Holzer ordered Brown inside and Brown informed Holzer that
she has difficulty getting into the car because of a knee surgery and her heart problems. Id. at
2:10–2:21. In response to being ordered into the vehicle, Brown told Holzer not to push her and
claimed that he smelled of alcohol and was an idiot. Id. at 2:20–2:22. Holzer again ordered Brown

into the vehicle and, once Brown was seated in the vehicle, moved one of her legs further inside the vehicle before shutting the door.  Id. at 2:30–2:52.

Haupert requested an ambulance come to check out Brown due to her heart issues.  Doc. 36-2 at 23:03–23:10.  When Haupert informed Brown of this, Brown responded repeatedly that she does not need an ambulance.  Id. at 23:35–23:45, 24:30.  Chief Mogard then arrived on scene. Id. at 27:15.  After being cleared by the ambulance crew, Brown was transported to the Walworth County Jail.  Doc. 52 ¶¶ 20, 32.  Sheriff Hamburger was never on scene but does drive past.  Doc. 52 ¶ 33.

Brown was ultimately charged with speeding, littering, obstructing law enforcement, resisting arrest, and assault on law enforcement.  Doc. 50 ¶ 24; Doc. 52 ¶ 21.  Brown eventually pled guilty to speeding and littering by paying her fine, but did not formally appear in court to enter a plea.  Doc. 38-2 at 1; Doc. 50 ¶ 30.  The charge of simple assault against a law enforcement officer was dismissed before Brown's payment of the fine.  Doc. 38-2 at 1.  The charges of obstructing police and resisting arrest were later dismissed on January 19, 2021, the same day Brown pled guilty to the speeding and littering charges by paying the fine.  Doc. 38-2 at 1–2. Brown then filed this suit on October 14, 2021.  Doc. 1.  Now the Defendants move for summary judgment based on qualified immunity and the merits of the case.  Docs. 33, 37.

## III.  Discussion

### A. Qualified Immunity for Officer Haupert and Deputy Holzer

"Qualified immunity shields police officers from liability for civil damages when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Westwater, 60 F.4th at 1128 (quoting White v. Pauly, 580 U.S. 73, 78–79 (2017) (per curiam)) (cleaned up).  When determining if an officer is protected by qualified

immunity, the Court must first find that there is sufficient evidence an officer violated a constitutional right and, second, that the right violated was so clearly established a reasonable officer would have known their conduct was unlawful.  Hansen v. Black, 872 F.3d 554, 557–58 (8th Cir. 2017).  The court may consider these steps in any order, Pearson v. Callahan, 555 U.S. 223, 236 (2009), but "[u]nless the answer to both of these questions is yes, the defendants are entitled to qualified immunity," Krout v. Goemmer, 583 F.3d 557, 564 (8th Cir. 2009).  Here, Brown makes her federal claims under the Fourth Amendment for excessive force and unlawful arrest.  Doc. 1.

### 1. Unlawful Arrest as alleged in Count I

An officer is entitled to qualified immunity when a warrantless arrest is supported by probable cause or if there is "at least arguable probable cause."  Ehlers v. City of Rapid City, 846 F.3d 1002, 1008–09 (8th Cir. 2017) (cleaned up and citations omitted).  Probable cause is evaluated on the totality of the circumstances at the time of arrest and exists if those circumstances "are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense."  Borgman v. Kedley, 646 F.3d 518, 523 (8th Cir. 2011) (cleaned up and citations omitted).  "Arguable probable cause exists even where an officer mistakenly arrests a suspect believing it is based in probable cause if the mistake is 'objectively reasonable.'"  Ehlers, 846 F.3d at 1009.

Supreme Court precedent makes "clear that an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause."  Devenpeck v. Alford, 543 U.S. 146, 153 (2004).

> The rule that the offense establishing probable cause must be "closely related" to, and based on the same conduct as, the offense identified by the arresting officer at the time of arrest is inconsistent with this precedent.  Such a rule makes the lawfulness of an arrest turn upon the motivation of the arresting officer—

eliminating, as validating probable cause, facts that played no part in the officer's expressed subjective reason for making the arrest, and offenses that are not "closely related" to that subjective reason.

Id. at 153–54.  Thus, even if arresting officers misidentify the general class of offense for which they believe there is probable cause, there can still be probable cause based on an objective view of the circumstances.  Id.; see also Scott v. United States, 436 U.S. 128, 138 (1978) ("[T]he fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action."); Whren v. United States, 517 U.S. 806, 814 (1996) ("the Fourth Amendment's concern with 'reasonableness' allows certain actions to be taken in certain circumstances, *whatever* the subjective intent.")

The first question then is whether Haupert had actual or arguable probable cause to arrest Brown.  Haupert admits that the traffic stop for speeding had concluded before Brown began to leave the scene.  Thus, Brown's speeding, which justified the initial stop and ticket, does not give Haupert the probable cause or arguable probable cause for the subsequent arrest.  Viewing the facts in the light most favorable to Brown, the dashcam and bodycam footage does not show Brown aggressively accelerating nor swerving towards Haupert.  Instead, the footage shows that Brown tossed her ticket out her window and began to drive forward with the intent to reenter traffic and leave the scene.  Brown was uncompliant, unpleasant, and agitated, but the manner of her initial departure did not give probable cause for an arrest for an assault of an officer.  Only after Brown re-stopped her vehicle and re-engaged with Haupert did she behave in a manner justifying arrest for obstructing law enforcement and resisting arrest, so neither of those offenses can supply the probable cause to re-stop the vehicle and arrest Brown.  An objective review of the facts in the

10

light most favorable to Brown points only to littering as the offense that could have supplied probable cause for the second stop.

Brown argues that littering cannot support probable cause to arrest her because Haupert initially accused Brown only of assault on a law enforcement officer. Nevertheless, "[w]hile it is assuredly good police practice to inform a person of the reason for [her] arrest at the time [s]he is taken into custody, [the Supreme Court has] never held that to be constitutionally required." Devenpeck, 543 U.S. at 155. That Haupert incorrectly identified which of Brown's actions gave her probable cause for the second stop does not equate to an absence of probable cause. Id. at 593–95. Further, Haupert's subjective belief that she somehow had been assaulted by Brown starting to drive off is irrelevant to the determination of probable cause. Scott, 436 U.S. at 138; Whren, 517 U.S. at 814.

Under South Dakota law "[n]o person may . . . throw, discard, or otherwise dispose of litter from any motor vehicle upon any public highway." SDCL § 34A-7-7. Though littering is only a class 2 misdemeanor in South Dakota, so long as a public, non-petty, offense is committed in the presence of a law enforcement officer, the person may be arrested under South Dakota law without a warrant. SDCL § 23A-3-2. Haupert, a law enforcement officer, witnessed Brown throw the speeding citation out of the window of her vehicle onto the highway. Brown does not contest that she littered, and the fact she did so is proven by the bodycam and dashcam footage, as well as by her pleading guilty to littering by payment of the associated fine. Indeed, Brown's guilty plea "forecloses a section 1983 claim for arrest without probable cause." Williams v. Schario, 93 F.3d 527, 528–29 (8th Cir. 1996). Haupert had probable cause to arrest Brown for littering. Because there was probable cause for Haupert's second stop of Brown and Brown's guilty plea by paying

the fine forecloses suit for an unlawful arrest, Haupert is entitled to qualified immunity on Count I.

Deputy Holzer, on the other hand, plainly had probable cause to believe Brown should be arrested. Holzer arrived on the scene after receiving Haupert's call for emergency assistance. Before Holzer even arrived, Haupert had informed Brown that she was under arrest and going to jail. No Potter County Defendant decided what charges Brown should face. Doc. 34 ¶ 34. Upon arriving at the scene, Holzer witnessed Brown refusing to comply with Haupert's orders and resisting Haupert's effort to be removed from the vehicle. Doc. 36-2 at 17:02–17:09. Brown then disregarded Holzer's initial orders, so Holzer assisted Haupert in physically removing Brown from the vehicle. Id.

Under South Dakota law, "any person who, by using or threatening to use . . . physical interference or obstacle, intentionally obstructs, impairs, or hinders the enforcement of the criminal laws or the preservation of the peace by a law enforcement officer . . . acting under color of authority" has obstructed a law enforcement officer. SDCL § 22-11-6. This statute is satisfied even if there is not physical resistance exerted by the defendant, in fact; "[r]efusing to comply with an officer's orders can constitute obstruction." Ehlers, 846 F.3d at 1009 (citing State v. Hodges, 631 N.W.2d 206, 211 (S.D. 2011)). Holzer arrived to find Brown refusing to comply with Haupert's orders, and Brown continued the obstructive behavior in Holzer's presence.

Holzer's observations, especially when coupled with Haupert's call for emergency assistance, would lead a reasonable officer to believe that Brown was committing an offense, specifically obstructing an officer. Thus, Holzer had probable cause to aid in the arrest of Brown and is entitled to qualified immunity on this count. Because both arresting officers at the scene

are entitled to qualified immunity on the unlawful arrest claim, Defendants Haupert and Holzer are entitled to summary judgment on Count I of the Complaint.

### 2. *Excessive Force as alleged in Count II*

The Fourth Amendment includes the right "to be secure . . . against unreasonable . . . seizures." U.S. Const. amend. IV. When a citizen claims that an officer used excessive force during an arrest or other seizure of her person, that claim is analyzed under the Fourth Amendment's objective reasonableness standard. Graham v. Connor, 490 U.S. 386, 388 (1989). "[D]etermining whether the force used to effect a particular seizure is reasonable requires balancing of the individual's Fourth Amendment interests against the relevant governmental interests." Cnty. of L.A. v. Mendez, 581 U.S. 420, 427 (2017) (cleaned up and quotation omitted). In other words, the totality of the circumstances are considered, including, "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396. Courts analyze these factors from "the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. (citation omitted).

For an excessive force claim to be viable, the officer must have some notice that their conduct was unconstitutional. Hope v. Pelzer, 536 U.S. 730, 741 (2002). The notice cannot be generalized, instead, "[t]he dispositive question is whether the violative nature of *particular* conduct is clearly established." Mullenix v. Luna, 577 U.S. 7, 12 (2015) (per curiam) (cleaned up and citation omitted). This is particularity important in the Fourth Amendment context because "[u]se of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent

squarely governs the specific facts at issue." <u>Kilsea v. Hughes</u>, 138 S. Ct. 1148, 1153 (2018) (per curiam) (cleaned up).

"The use of force is least justified against a nonviolent misdemeanant who does not flee or actively resist and poses little threat to the officers or the public." <u>Kohorst v. Smith</u>, 968 F.3d 871, 876 (8th Cir. 2020). In such cases the use of more than de-minimus force is objectively unreasonable. <u>See generally</u> <u>Kelsay v. Ernst</u>, 933 F.3d 975, 985 (8th Cir. 2019) (Smith, C.J., dissenting) (discussing where use of force by police is unreasonable). However, when a person being arrested uses passive resistance, including refusal to follow orders, the police are justified in employing some force. <u>Kohorst</u>, 968 F.3d at 876; <u>see also</u> <u>Ehlers</u>, 846 F.3d at 1011. The Eighth Circuit has "upheld the use of force where a suspect is non-compliant and resists arrest or ignores commands from law enforcement." <u>Kohorst</u>, 968 F.3d at 876; <u>see</u> <u>Jackson v. Stair</u>, 944 F.3d 704, 711 (8th Cir. 2019).

The facts in this case parallel those in <u>Foster v. Metropolitan Airports Commission</u>. 914 F.2d 1076 (8th Cir. 1990). In that case, an airport traffic officer issued a suspect a ticket for refusing to move his vehicle from a busy airport terminal after three warnings from the officer to do so. <u>Id.</u> at 1077. Upon issuing the suspect the ticket, the suspect became upset and tore up the ticket. <u>Id.</u> The suspect then attempted to roll up the car window and lock the vehicle doors. <u>Id.</u> Two additional officers came to the scene and the suspect refused to get out of his vehicle because his son was in the vehicle. <u>Id.</u> The suspect "clung to the frame of the door" to resist being removed. <u>Id.</u> Officers "forcibly removed [the suspect] from the car and handcuffed him" and then shoved him up against two walls without further resistance from the suspect. <u>Id.</u> The suspect then filed a 1983 action alleging unlawful arrest and excessive force. <u>Id.</u> at 1078. The district court granted summary judgment finding that the officers had probable cause for the arrest and did not use

14

excessive force, and the United States Court of Appeals for the Eighth Circuit affirmed. Id. at 1078, 1083.

The Eighth Circuit's analysis in Foster of the officer pulling the suspect from the car for tearing up the ticket in the officer's presence was brief, stating:

> [Suspect's] allegations of excessive force prior to his wife's return to the car are easily disposed of.  Although we understand why [suspect] initially resisted [officer's] request that he get out of the car (his fear that his son would be left unattended), the officer's use of force in pulling [suspect] from the car and handcuffing him was reasonable under the circumstances, and no juror could reasonably find otherwise.

Id. at 1082; see also Garcia v. City of New Hope, 984 F.3d 655, 668 (8th Cir. 2021) (abrogated on causation grounds).  Addressing the suspect's argument that the force used was in retaliation to his disrespect to the officer, the Eighth Circuit stated simply "the officers' evil intentions, assuming [suspect] could establish them at trial, are not relevant to a [F]ourth [A]mendment claim of excessive force." Id. The Eighth Circuit concluded:

> Here, [suspect] must concede that some force was objectively reasonable due to his earlier display of resistance.  Although in hindsight such force might not have been necessary, we are not here to judge the officer's conduct from hindsight, but rather to place ourselves in the shoes of a reasonable officer under the circumstances.

Id. at 1082–83.

The facts and holding of Foster, rather than putting Haupert on notice that her acts would cause a constitutional violation, justify Haupert's conduct, which was similar to what the officers did in Foster.  Unlike Foster where the suspect was immediately removed from a stationary vehicle for tearing up a ticket in the officer's presence, Brown's car was moving shortly after she discarded the ticket out her window, so Haupert ran after the vehicle, pulled the door open, and issued verbal orders after Brown threw the ticket onto the roadway. See id.; Garcia, 984 F.3d at 668 (holding that grabbing a suspect as they step out of the car and handcuffing them after engaging in a shouting

15

match with the officer and refusing to follow verbal orders was reasonable). The factual differences between Foster and Brown's case are immaterial, especially when considering that the suspect in Foster was manhandled to a much greater extent than was Brown. Brown may argue that such force was not necessary in hindsight, but that is not the standard by which reasonableness is determined. Graham, 490 U.S. at 396.

Brown's only offense justifying the second stop was littering. Thus, an objective officer would view Brown as a nonviolent misdemeanant where only a minimal use of force would be merited. Montoya v. City of Flandreau, 669 F.3d 867, 871–73 (8th Cir. 2012). But again, Foster is closely analogous. In Foster, the angry and frustrated suspect made a display of resistance after being issued a parking ticket, and the Eighth Circuit found his ripping up the ticket and belligerence to justify pulling the suspect from the non-moving vehicle. In the case at hand, upon seeing the commission of a nonviolent misdemeanor as Brown began to drive away from a concluded traffic stop, Haupert ran after the vehicle, grabbed a hold of it, and yelled orders at Brown. This initial force was minimal, and Haupert's greater use of force by going "hands on" with Brown followed only after Brown refused to turn her vehicle off and get out of her vehicle voluntarily. The Foster case supports such a use of force, rather than putting Haupert on notice that her conduct was unconstitutional. Hope, 536 U.S. at 741.

Deputy Holzer also did not use excessive force. A qualified immunity analysis does not look at the events with 20/20 hindsight, but analyzes the totality of circumstances from what a reasonable officer would experience. Holzer arrived on the scene after a call for emergency assistance. Haupert informed Holzer that Brown had attempted to hit her with the vehicle. Thus, the alleged crime at issue, as far as Holzer knew, was assault on a law enforcement officer. White, 580 U.S. at 81 ("No settled Fourth Amendment principle requires [an] officer to second-guess the

earlier steps already taken by his or her fellow officers"). Such a crime is serious and poses a threat to law enforcement. Though Brown vehemently denied Haupert's account, Holzer's reliance on a fellow law enforcement officer's assessment was reasonable.

Upon approaching Haupert and Brown, Holzer saw Brown actively resisting Haupert by pulling against her and refusing to follow Haupert's orders. Brown also refused to follow the two orders Holzer gave to her. Holzer witnessed Brown both actively and passively resist law enforcement. Holzer then took Brown's wrist and pulled her out of the vehicle, held her against the vehicle while she was handcuffed, and then walked Brown to Haupert's patrol car. Holzer's use of force did not cause Brown to make any sound of surprise, pain, or alarm. The force used was not even sufficient to break Brown's speech cadence as she complained about Haupert.

Brown said nothing to Holzer while walking from one car to the next about her knee or difficultly walking. Brown did not appear to have difficulty walking while being escorted to the patrol car. Brown told Holzer not to push her into the vehicle because she had knee surgery. Holzer responded that he was not pushing her and then verbally ordered Brown into the patrol car as she lambasted Holzer. Holzer again verbally ordered Brown into the car before shutting her inside the patrol vehicle. Thus, Holzer—responding to what he believed to be an attempt at a violent crime, putting officer safety at risk, and observing Brown actively resisting and ignoring verbal commands—committed no Fourth Amendment violation through excessive force in his removal of Brown from her vehicle and assistance in cuffing Brown.

Because Haupert and Holzer did not violate a clearly established right, they are entitled to qualified immunity on this count. As such, Defendants Haupert and Holzer are entitled to summary judgment on Count II of the Complaint.

17

### B. *Monell* Liability against the City of Gettysburg and Potter County

Section 1983 provides a cause of action against any "person" who, acting "under color of" state law, deprives the plaintiff of "rights, privileges, or immunities secured by the Constitution." 42 U.S.C. § 1983. Municipalities and their employees are suable "persons" under § 1983, and the employees can be sued in both their official and individual capacities. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690 (1978); Johnson v. Outboard Marine Corp., 172 F.3d 531, 535 (8th Cir. 1999). Brown has only sued the officers in their individual capacities. Doc. 1.

The Supreme Court in Monell v. Department of Social Services held that limits exist on suing municipalities under § 1983. 436 U.S. at 690–95. Most significantly, Monell held that a municipality is not liable under § 1983 simply because one of its employees violated the Constitution. Id. at 691. Rather, a plaintiff suing a municipality under § 1983 must show that the municipality's "policy" or "custom" caused the plaintiff's constitutional deprivation. Id. at 694. This rule "was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." Pembaur v. City of Cincinnati, 475 U.S. 469, 479 (1986).

"Policy" and "custom" mean different things under Monell. Corwin v. City of Independence, 829 F.3d 695, 699–700 (8th Cir. 2016). A municipality's official policy includes actions by its legislative body, Connick v. Thompson, 563 U.S. 51, 61 (2011), and decisions or actions by a municipal employee who has "final policymaking authority" as to "the subject matter in question," Pembaur, 475 U.S. at 483 (plurality opinion). There are also "limited circumstances" where a municipality's failure to train its employees can constitute an official policy. Connick, 563 U.S. at 61. To prove a municipal custom, on the other hand, a plaintiff must show:

> (1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) deliberate indifference to

18

> or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and (3) that plaintiff was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was a moving force behind the constitutional violation.

Corwin, 829 F.3d at 700 (citation omitted).

A municipality is not liable under § 1983 unless there is "a direct causal link between" the municipal policy or custom and the plaintiff's constitutional deprivation. City of Canton v. Harris, 489 U.S. 378, 385 (1989); see also Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 404 (1997) (explaining that the plaintiff must show that the municipality, "through its *deliberate* conduct, . . . was the 'moving force' behind the injury alleged"). Moreover, "there must be an unconstitutional act by a municipal employee before a municipality can be held liable," although "there need not be a finding that a municipal employee is liable in his or her individual capacity." Webb v. City of Maplewood, 889 F.3d 483, 487 (8th Cir. 2018) (citation omitted).

Brown argues that the municipal defendants created a "custom" of excessive use of force or a failure to train. Doc. 49 at 20. Regarding the first element of establishing a "custom," the Eighth Circuit has not adopted any clear-cut rule for how often misconduct must occur to be considered a pattern, Ball-Bey v. Chandler, 415 F. Supp. 3d 884, 895 (E.D. Mo. 2019), except to say that "a single act" is not enough, Bolderson v. City of Wentzville, 840 F.3d 982, 986 (8th Cir. 2016). See also Brewington v. Keener, 902 F.3d 796, 802 (8th Cir. 2018) (explaining that "in the face of an express municipal policy prohibiting excessive force," two instances of excessive force "cannot be considered a pattern of widespread and pervasive unconstitutional conduct").

The Eighth Circuit in Meier v. St. Louis found enough evidence of a custom without specifying the number of times the misconduct occurred. 934 F.3d 824, 828 (8th Cir. 2019). The plaintiff in Meier claimed that the City of St. Louis had a custom of reporting vehicles as "wanted" on a law enforcement computer network in hopes of detaining the vehicle against the owner's

19

wishes and without a warrant. Id. The Eighth Circuit concluded that a reasonable juror could find a "continuing, widespread, persistent practice" of using "wanted" reports to seize vehicles without a warrant for investigative purposes based on testimony by a criminal defense attorney that the St. Louis Police Department "'regularly' detains vehicles suspected of criminal involvement in hopes of identifying the owner or driver of the vehicle;" testimony by a training officer that she teaches officers in St. Louis County that "'wanted' means once you stop that vehicle and confirm the status of it, that vehicle would then be held if it meets the criteria from the originating agency;" and testimony from a captain of the St. Louis Police Department that he understands that "reporting a vehicle as wanted on [the computer network] is a request that the investigating officer detain the vehicle for us." Id. (cleaned up).

First, as explained above, Haupert and Holzer are entitled to qualified immunity because their conduct neither violated Brown's constitutional rights nor constituted what a reasonable officer would know to be unlawful. Thus, there is no constitutional violation to attribute to the City or County's customs and practices. Cf. Saunders v. Thies, 38 F.4th 701, 715 (8th Cir. 2022); Doe v. Aberdeen Sch. Dist., 42 F.4th 883, 894 (8th Cir. 2022).

Second, there is no evidence that Haupert's or Holzer's conduct was a "continuing, widespread, persistent pattern of unconstitutional misconduct." There is no evidence that Holzer or other officers in Potter County Sheriff's office have been accuse of more than this one instance of alleged excessive use of force. One alleged instance of misconduct is insufficient to demonstrate a pattern as required under Monell, so Brown cannot establish neither a pattern nor an unconstitutional "custom" on the part of Potter County. As such, Potter County is entitled to summary judgment.

Brown's arrest appears to be Haupert's first incident requiring the use of force. Doc. 40-3 at 23–24. Brown argues that, after her arrest, two unrelated incidents when Haupert admitted to using force constitute a pattern for purposes of <u>Monell</u>, Doc. 49 at 19–20, but no evidence exists that those incidents involved *unconstitutional* uses of force. Haupert's deposition reveals that she used minimal force on these occasions only after the suspect at issue refused to listen to orders of law enforcement. The simple fact that minimal force was used on two non-compliant people after the incident with Brown does not create a "continuing, widespread, persistent *pattern* of *unconstitutional* misconduct."

Brown also asserts liability for a lack of training, which can exist if "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that [the municipality] can reasonably be said to have been deliberately indifferent to the need." <u>Amrbose v. Young</u>, 474 F.3d 1070, 1079–80 (8th Cir. 2007). Here, the City of Gettysburg lacked notice of any potential wrongdoing by Haupert because this was evidently Haupert's first incident involving the use of force. There is also no evidence that the training was so deficient that it arose to deliberate indifference. The City of Gettysburg and Potter County do not require use-of-force training beyond what is required at the state level, but that does not equate to deliberate indifference. Haupert and Holzer were trained on the use-of-force at the state law enforcement academy, the City and County have a use-of-force policy, and there is no evidence that there have been previous excessive force issues under this policy. There is no evidence that these training programs are deficient, and the policies of the City and County are not obviously and deliberately indifferent to constitutional rights. <u>See</u> <u>City of Canton v. Harris</u>, 489 U.S. 378, 392 (1989) ("It would also engage the federal courts in an endless exercise of second-guessing municipal employee-training programs. This is an exercise we believe the federal courts

are ill suited to undertake . . . ."). As such, the city of Gettysburg and Potter County are entitled to summary judgment on the claims against them.

## C. Supervisory Liability

Brown also alleges that Hamburger and Mogard are responsible for the alleged wrongful acts of Haupert and Holzer because they acted with deliberate indifference. The Eighth Circuit "has consistently recognized a general rule that, in order for municipal liability to attach, individual liability first must be found on an underlying substantive claim. Similarly, to maintain an action for training or supervisory liability, a plaintiff must show the failure to train or supervise caused the injury." Saunders, 38 F.4th at 715. Because Brown failed to show that Holzer or Haupert violated her rights, Brown cannot maintain a cause of action against any of the defendants. See id.; Doe, 42 F.4th at 894.

## D. State Law Claims against Defendants

Brown's remaining claims against the defendants are based in state law, and there is no complete diversity of citizenship here. Therefore, this Court would have to exercise supplemental jurisdiction under 28 U.S.C. § 1367(a), which permits a district court to handle state law claims that are a part of the same case or controversy as the claims that fall within the district court's original jurisdiction. Federal courts generally under 28 U.S.C. § 1367(c)(3) decline to exercise supplemental jurisdiction if "the district court has dismissed all claims over which it has original jurisdiction" unless the case is close to or amid trial or other such reasons exist to retain jurisdiction. Id.; see also Zutz v. Nelson, 601 F.3d 842, 850 (8th Cir. 2010) (cleaned up and citation omitted). "The district court is afforded broad discretion in determining whether to exercise supplemental jurisdiction." Crest Constr. II, Inc. v. Doe, 660 F.3d 346, 359 (8th Cir. 2011). "In determining whether to exercise supplemental jurisdiction, courts consider judicial efficiency,

convenience, and fairness to litigators." Magee v. Trs. of the Hamline Univ., 957 F. Supp. 2d 1047,1060 (D. Minn. 2013). "In assessing efficiency, convenience, and fairness, courts look to a number of factors, including the stage of the litigation; the difficulty of the state claim; the amount of time and energy necessary for the claim's resolution; and the availability of a state forum." Id. (cleaned up and citation omitted). "Courts should exercise judicial restraint and avoid state law issues wherever possible . . . ." Id. Although discovery is complete, this case does not have the hallmarks of a case where "substantial preparation has gone into the dependent claims," which provides a "fair" reason to decline to exercise supplemental jurisdiction. Id. (cleaned up and citation omitted). Because Brown has not stated a viable claim against any of the Defendants within the original jurisdiction in federal court, this Court declines to exercise supplemental jurisdiction over Brown's state law claims. See Mountain Home Flight Serv., Inc. v. Baxter Cnty., 758 F.3d 1038, 1045 (8th Cir. 2014) (district court acted within its discretion declining to exercise supplemental jurisdiction after dismissing § 1983 claims); see also Hansell v. City of Ati. City, 152 F. Supp. 2d 589, 602–03 (D.N.J. 2001) ("[Section] 1983 does not create a cause of action based upon violations of state statutes.").

### E. Motion to Exclude Expert Testimony

Because this Court is granting summary judgment on the federal law claims and declining to exercise supplemental jurisdiction over the remaining state law claims, the motion to exclude expert testimony can be denied as moot.

### IV. Conclusion

For the reasons discussed above it is hereby

ORDERED that the Potter County Defendants' Motion for Summary Judgment, Doc. 33, is granted. It is further

ORDERED that the Gettysburg Defendants' Motion for Summary Judgment, Doc. 37, is granted. It is finally

ORDERED that the Gettysburg Defendants' Motion to Exclude Expert Testimony, Doc. 42, is denied as moot.

DATED this ___21ˢᵗ___ day of March, 2023.

BY THE COURT:

ROBERTO A. LANGE
CHIEF JUDGE

24